**Gregory F. DANIEL, M.D., et al., Plaintiffs,**

v.

**AMERICAN BOARD OF EMERGENCY MEDICINE, et al., Defendants.**

**No. 90–CV–1086A.**

United States District Court, W.D. New York.

Aug. 21, 2002.

Jaeckle, Fleischmann & Mugel, LLP, Ralph L. Halpern, Mary C. Fitzgerald, of Counsel, Buffalo, Shearman & Sterling, George J. Wade, Kathleen M. Comfrey, of Counsel, New York City, for Plaintiffs.

Gibson, McAskill & Crosby, LLP, Charles S. Desmond, II, of Counsel, Buffalo, NY, for Defendant Kettering Medical Center.

LeBouef, Lamb, Greene & MacRae, L.L.P., Jonathan A. Damon, of Counsel, Buffalo, NY, for Defendants Children's Hospital—San Diego and University Medical Center Corporation.

Phillips, Lytle, Hitchcock, Blaine & Huber, Robert E. Glanville, of Counsel, Buffalo, NY, Counsel to Defendant ABEM and Liaison Counsel for Hospital Defendants.

## ORDER

ARCARA, District Judge.

This case was referred to Magistrate Judge Leslie G. Foschio, pursuant to 28 U.S.C. § 636(b)(1), on April 24, 1991. Summary judgment motions were filed by defendant Kettering Medical Center on May 5, 2000, and by defendants Children's Hospital—San Diego and University Medical Center Corporation on May 9, 2000. On September 27, 2001, Magistrate Judge Foschio filed a Report and Recommendation, recommending that the defendants' motions for summary judgment be granted.

Plaintiffs filed objections to the Report and Recommendation on November 13, 2001. Oral argument on the objections was held on August 14, 2002.

Pursuant to 28 U.S.C. § 636(b)(1), this Court must make a *de novo* determination of those portions of the Report and Recommendation to which objections have been made. Upon a *de novo* review of the Report and Recommendation, and after reviewing the submissions and hearing argument from the parties, the Court adopts the proposed findings of the Report and Recommendation.

Accordingly, for the reasons set forth in Magistrate Judge Foschio's Report and Recommendation, the Court grants the motions of defendants Kettering Medical Center, Children's Hospital—San Diego, and University Medical Center Corporation for summary judgment. Pursuant to Rule 54(b) of the Federal Rules of Civil Procedure, the Court hereby determines that there is no just reason for delay and orders the Clerk of Court to enter final judgment in favor of these defendants.

IT IS SO ORDERED.

**REPORT and RECOMMENDATION**

FOSCHIO, United States Magistrate Judge.

### *JURISDICTION*

This matter was referred to the undersigned on April 24, 1991 by the Hon. Richard J. Arcara for all pretrial matters. It is currently before the court on summary judgment motions filed on May 5, 2000 by Defendants Kettering Medical Center (Docket Item No. 776), and on May 9, 2000 by Children's Hospital—San Diego (Docket Item No. 782), and by University Medical Center Corporation (Docket Item No. 783).

### *BACKGROUND*

Plaintiffs, emergency medicine physicians, commenced this action on September 25, 1990, challenging the refusal of the American Board of Emergency Medicine ("ABEM") to permit them to seek certification as ABEM Diplomates in emergency medicine. In their Second Amended Complaint filed January 13, 1994, Plaintiffs asserted causes of action under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.* ("the Sherman Act"), seeking relief pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. § 12 *et seq.* Defendants are public and private teaching hospitals allegedly operating residency programs in emergency medicine with the exception of Defendants ABEM and the Council of Emergency Residency Directors ("CORD").[1]

On February 18, 1994, Defendants were served with Plaintiffs' requests for discovery on the merits. Plaintiffs moved on February 24, 1994 for class certification and Defendants moved on March 16, 1994 to stay class certification.

Beginning April 20, 1994, many of the Defendant hospitals moved to dismiss the Second Amended Complaint for lack of personal jurisdiction, including, among others, Kettering Medical Center ("Kettering"), University Medical Center, Tucson, Arizona ("UMCC"), and Children's Hospital—San Diego ("CHSD"). In particular, Kettering, UMCC and CHSD each moved to dismiss for lack of personal jurisdiction, and UMCC and CHSD also moved to dismiss for improper venue. On April 29, 1994, before any responses to Plaintiffs' discovery requests were served, the court stayed discovery on the merits pending the determination of the jurisdictional motions

---

1. The caption does not include the ten public hospitals sued by Plaintiffs which have been dismissed from the action based on 11th Amendment, state action or Local Government Antitrust Act immunity grounds.

and discovery limited to the jurisdictional issues ensued.

In a Report and Recommendation filed January 16, 1996 (Docket Item No. 435), the undersigned, *inter alia*, recommended denying the motions to dismiss for lack of personal jurisdiction filed by Kettering, UMCC and CHSD be denied. Ohio State University Hospital ("OSUH") was among several other Defendants for whom dismissal was recommended based on 11th Amendment and state action immunity. Objections to the Report and Recommendation were filed by several parties including OSUH (March 5, 1996, Docket Item No. 473), UMCC and CHSD (March 8, 1996, Docket Item No. 483). On February 23, 1996, the undersigned granted Defendants' motion to continue the stay as to merit-based discovery pending Judge Arcara's decision on the objections to the Report and Recommendation.

On October 1, 1996, while objections to the Report and Recommendation were pending, Plaintiffs moved on October 1, 1996, to vacate the stay of discovery as to class certification issues. That motion was denied by order dated November 20, 1996.

On November 19, 1997, Judge Arcara rejected all Defendants' objections to the Reports and Recommendations filed January 16, 1996.[2] Order filed November 19, 1997 (Docket Item No. 582), at 5–9; *Daniel v. American Board of Emergency Medicine*, 988 F.Supp. 127, 142–45 (W.D.N.Y. 1997).[3] Extensive settlement discussions were conducted between February and August, 1998 under court supervision. When no settlement was reached the court, on October 20, 1998, vacated the stay on discovery as to class certification

issues and issued a scheduling order directing such discovery.

In an order filed February 12, 1999, the undersigned stated the court would permit summary judgment motions "which do not require substantial additional discovery" to be filed. Decision and Order filed February 12, 1999 (Docket Item No. 642), at 7. Thereafter, on April 7, 1999, Riverside Methodist Hospitals ("Riverside") moved for summary judgment on three alternative grounds including state action immunity, an asserted education exemption to the Sherman Act, and on the merits of the alleged conspiracy. On June 16, 1999, Defendant Our Lady of Mercy Medical Center ("OLM") moved for summary judgment, asserting essentially the same grounds for relief as Riverside asserts. On January 20, 2000, the undersigned issued a Report and Recommendation recommending granting Riverside's motion on the basis of state action immunity, but denying the motion on the alternative grounds, and denying OLM's motion in its entirety. Report and Recommendation filed January 20, 2000 (Docket Item No. 751). Objections to the Report and Recommendation, filed on February 23, 2000 by Riverside (Docket Item No. 757), and by Plaintiffs (Docket Item No. 758), remain pending before the District Judge.

On May 5, 2000, Defendant Kettering filed a motion for summary judgment asserting that it is entitled to be dismissed from this case on the basis of state action immunity. The motion was accompanied by a Statement of Undisputed Facts (Docket Item No. 777), a Memorandum of Law (Docket Item. No. 778) ("Kettering's Memorandum"), the Affidavits of Glenn C.

---

**2.** In a Report and Recommendation filed February 12, 1999 (Docket Item No. 642), the undersigned recommended that Defendants' motions to certify the jurisdictional issues for interlocutory appeal be granted.

**3.** Subsequent citations to *Daniel, supra,* will reference only the pages of the decision as reported in 988 F.Supp.

Hamilton and Nehemias Velasco. On May 9, 2000, similar motions for summary judgment seeking dismissal based on state action immunity were filed by Defendants CHSD and UMCC. Each motion was accompanied by a supporting memorandum of law (Dockets Item Nos. 784 and 785) (respectively, "CHSD's Memorandum" and "UMCC's Memorandum"). Plaintiffs filed a statement pursuant to Western District of New York Local Rule 56 in opposition to each of the three pending summary judgment motions (Docket Items No. 791, 792 and 793), on July 5, 2000, and one combined Memorandum of Law (Docket Item No. 795) ("Plaintiffs' Memorandum") was filed in opposition to the three motions on July 13, 2000. Plaintiffs also moved pursuant to Fed.R.Civ.P. 56(f) for discovery necessary to prepare further responses to the Moving Defendants' summary judgment motions (Docket Item No. 790).

On July 26, 2000, UMCC and CHSD each filed a combined memorandum of law in response to Plaintiff's Rule 56(f) motion and in further support of summary judgment (Docket Items 801 and 803) (respectively, "UMCC's Reply Memorandum" and "CHSD's Memorandum"), as well as Declarations of Ann Marie Waupotic, Esq. (Docket Items Nos. 802 and 804). Kettering, also on July 26, 2000, filed a statement in opposition to Plaintiff's statement pursuant to Rule 56 (Docket Item No. 805), and a Reply Memorandum in further support of summary judgment (Docket Item No. 806) ("Kettering's Reply Memorandum").[4]

Plaintiff's motion for Rule 56(f) discovery was granted by the undersigned on December 28, 2000 (Decision and Order, filed December 28, 2000 (Docket Item No. 816)), and Plaintiffs were given 90 days to complete the requested discovery and an additional 30 days to file supplemental memoranda of law in opposition to Moving Defendants' summary judgment motions with Moving Defendants' responses due 30 days thereafter. Accordingly, on May 7, 2001, Plaintiffs filed the Supplemental Affidavit of Mary Fitzgerald, Esq. in opposition to summary judgment (Docket Item No. 820) ("Fitzgerald Affidavit") and a supplemental statement pursuant to Local Rule 56 (Docket Item No. 821).

Supplemental Replies to Plaintiffs' Opposition to Summary Judgment were filed by Defendant Medical Center on June 7, 2001 (Docket Item No. 823) ("UMCC's Supplemental Reply"), and by Defendant CHSD on June 12, 2001 (Docket Item No. 825) ("CHSD's Supplemental Reply"). CHSD also filed the Declaration of Andrea Resnick, Esq. on June 12, 2001 (Docket Item No. 826) ("Resnick Declaration"). On June 18, 2001, Kettering filed a Supplemental Memorandum of Law (Docket Item No. 829) ("Kettering's Supplemental Memorandum"). Oral argument was deemed unnecessary. Based on the following, summary judgment should be GRANTED as to Defendants Kettering, UMCC and CHSD.

### FACTS[5]

The American Board of Medical Specialties ("ABMS"), as an umbrella organization for various medical specialty boards, authorizes its member boards to issue certificates in their respective fields, thereby conferring the status of Diplomate on qualifying physicians in their medical specialties. Defendant American Board of Emergency Medicine ("ABEM") is one such medical specialty board.

---

**4.** Defendants Kettering, UMCC and CHSD are collectively referred to as "Moving Defendants".

**5.** The fact statement is taken from the pleadings and motion papers filed in connection with the instant motions.

The Accreditation Council of Graduate Medicine Education ("ACGME") is the governing body for accreditation of medical education programs, although the Residency Review Committee ("RRC") performs the actual evaluation of programs for the particular fields of medicine involved, with the emergency medicine residency programs reviewed and evaluated by the Residency Review Committee for Emergency Medicine ("RRC–EM"). ABEM was the only emergency medicine specialty board recognized by the ABMS and the American Medical Association ("AMA") when this action was commenced and, thus, had substantial influence in the specialty area of emergency medicine and the medical community throughout the United States. ABEM was formed and created by the American College of Emergency Physicians ("ACEP"), a non-defendant alleged co-conspirator, which is a national professional trade association of emergency physicians. ACEP continues to be a sponsor of ABEM.

ABEM administers a certification examination in emergency medicine to physicians found eligible, based on the ABEM's published criteria, to sit for the examination consisting of written and oral parts. Physicians are given the status of Diplomate of ABEM and considered ABEM board certified physicians upon passing the certification examination.

Beginning with ABEM's inception in 1976 and continuing until June 30, 1988, two paths of eligibility were available for ABEM's certification examination. Under the first path, eligibility could be established by completing an approved three year residency training program in emergency medicine ("the residency track"). Eligibility could be established under the second path by completing 7,000 hours and 60 months of practice and/or teaching in emergency medicine, provided 2,800 hours were accumulated within 24 consecutive months ("the practice track"). A third and less common eligibility track, the special application track, permitted physicians demonstrating training or experience equivalent to the residency or practice tracks to sit for the examination, although it is undisputed that few physicians have been qualified to sit for the ABEM certification examination under the special application track.

ABEM's original charter provided for the discontinuance of the practice track on June 30, 1988. Prior to its discontinuance, ABEM had certified 8,000 emergency physicians, 7,000 of whom qualified to sit for the examination pursuant to the practice track. Thus, after 1988, completion of an accredited emergency medicine residency training program offered by the hospital Defendants and other hospitals remains the only pragmatic path to qualify to sit for the ABEM's certification examination.

Plaintiffs maintain that ABEM, ACEP and AMA arranged to be the sole sponsors of RRC–EM, thereby permitting ABEM to exert substantial impact and influence on the specialty of emergency medicine, including the control and development of emergency medicine residency programs. *Id.* The alleged conspiracy involves an agreement among ABEM, CORD, and the hospital Defendants, and includes ABEM's elimination of the practice track, the rejection by various professional organizations of "alternative pathways" to residency programs to attain ABEM certification, RRC–EM's setting of special requirements including ABEM certification for faculty in emergency medicine residency programs, ACEP and ABEM's encouragement of hospitals to hire ABEM certified emergency physicians, and the refusal of each hospital Defendant to hire emergency physicians who are not ABEM certified or eligible.

Plaintiffs maintain that each hospital Defendant is engaged in the administration and operation of at least one post-graduate emergency medicine residency program. Defendants allegedly benefit from the alleged conspiracy by creating and sustaining artificially inflated prices for the services of ABEM certified and ABEM eligible physicians, resulting in a decreased supply of ABEM certified residency programs which reduces competition against the hospital Defendants' emergency medicine residency programs. Such restraints are alleged to also ensure an adequate supply of residents who provide medical labor at costs lower than for full-fledged physicians, generating increased funding for their emergency medicine residency programs, and creating and sustaining artificially inflated Medicare, Medicaid, workers' compensation and insurance reimbursement. The public allegedly is damaged by the resulting artificially inflated emergency medicine costs, misleading information as to the qualifications of emergency medicine physicians, and a shortage of emergency medicine physicians as those ineligible for ABEM-certification are forced out of the field by decreased employment opportunities. Plaintiffs also assert that ABEM conspired with other non-Defendant organizations to keep the practice track closed and to prevent development of alternative paths to ABEM certification.

Plaintiffs allege that ABEM and the hospital Defendants, including Kettering, UMCC and CHSD, and various professional organizations in the field of emergency medicine, including Defendant Council of Emergency Medical Residency Directors ("CORD"), conspired to restrain trade by limiting eligibility for ABEM certification to the residency program. Plaintiffs claim the conspiracy was effected through the actions of various ABEM certified physicians who were either employed or affiliat-

ed with the hospital Defendants' residency programs in emergency medicine.

Kettering maintains that it is merely a participating institution in an emergency medicine residency program sponsored by Wright State University, a state university in Ohio, through Wright State University's School of Medicine ("WSUSOM"). According to Kettering, WSUSOM, which is not a defendant to this action, would be shielded from liability in this case by state action immunity, and such immunity would also shield Kettering from liability. UMCC asserts that it does not sponsor its own emergency medicine residency program but, rather, operates the emergency medicine program at the University Medical Center, sponsored by the University of Arizona College of Medicine ("UACM"), a department of the University of Arizona ("U of A"), neither of which is a defendant in this case. According to the UMCC, UACM would be shielded from liability in this case based on both Eleventh Amendment immunity and state action immunity. Finally, CHSD maintains that the state action immunity which the court found shields University of California (San Diego) Medical Center ("San Diego Medical Center"), from liability in this action extends to CHSD as CHSD is merely a participating institution in the emergency medicine residency program sponsored by San Diego Medical Center.

## DISCUSSION

### 1. Summary Judgment

Summary judgment of a claim or defense will be granted when the moving party demonstrates that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a) and (b); *Celotex Corp. v. Catrett*, 477 U.S. 317, 331, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Rattner v. Netburn*, 930 F.2d 204, 209 (2d Cir.1991). The moving party for summary judgment bears the burden of establishing the nonexistence of any genuine issue of material fact. If there is any evidence in the record based upon any source from which a reasonable inference in the non-moving party's favor may be drawn, the moving party cannot obtain a summary judgment. *Catrett, supra,* at 331, 106 S.Ct. 2548.

Summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no issue as to any material fact, and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). "[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson, supra,* at 247–48, 106 S.Ct. 2505. Whether a fact is material depends on the substantive law of the claim and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* at 248, 106 S.Ct. 2505.

> [W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.' Such a motion, whether or not accompanied by affidavits, will be 'made and supported as provided in this rule [Fed.R.Civ.P. 56],' and Rule 56(e) therefore requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'

*Catrett, supra,* at 324, 106 S.Ct. 2548 (quoting Fed.R.Civ.P. 56).

Thus, "as to issues on which the non-moving party bears the burden of proof, the moving party may simply point out the absence of evidence to support the non-moving party's case." *Nora Beverages, Inc. v. Perrier Group of America, Inc.*, 164 F.3d 736, 742 (2d Cir.1998).

Once a party moving for summary judgment has made a properly supported showing as to the absence of any genuine issue as to all material facts, the nonmoving party must, to defeat summary judgment, come forward with evidence that would be sufficient to support a jury verdict in its favor. *Goenaga v. March of Dimes Birth Defects Foundation*, 51 F.3d 14, 18 (2d Cir.1995). In opposing a motion for summary judgment a party "may not simply rely on conclusory statements or on contentions that the affidavits supporting the motion are not credible." *Goenaga, supra,* at 18 (citing cases). Further, where the burden of proof on an issue for which summary judgment is sought is on the movant, should the movant fail to meet its initial burden of establishing the absence of any genuine issue of material fact as to that issue, the non-movant will prevail even if the non-movant submits no evidentiary matter establishing there is indeed a genuine issue for trial. *Zanghi v. Incorporated Village of Old Brookville*, 752 F.2d 42, 47 (2d Cir.1985).

■ Although Plaintiffs allege causes of action under both Sections 1 and 2 of the Sherman Antitrust Act, the hospital Defendants, including Moving Defendants, are alleged to have violated only § 1 which provides that "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce ... is declared to be illegal ...." 15 U.S.C. § 1. A violation of § 1 is demonstrated by establishing a combination or

some form of concerted action between at least two legally distinct economic entities which constitutes an unreasonable restraint on interstate trade or commerce. *Standard Oil of New Jersey v. United States,* 221 U.S. 1, 31 S.Ct. 502, 55 L.Ed. 619 (1911); *Estate Construction Co. v. Miller & Smith Holding Co., Inc.,* 14 F.3d 213, 220 (4th Cir.1994); *Capital Imaging Associates, P.C. v. Mohawk Valley Medical Associates, Inc.,* 996 F.2d 537, 542 (2d Cir.), *cert. denied,* 510 U.S. 947, 114 S.Ct. 388, 126 L.Ed.2d 337 (1993). Accordingly, Moving Defendants seek summary judgment only with regard to Plaintiffs' § 1 claim.

**2. *Eleventh Amendment and State Action Immunity***

As stated, each Moving Defendant maintains it is a private hospital participating in an emergency medicine residency program established by a state-supported university and, as such, is immune from liability in the instant action based on state action immunity derived from the associated state university's state action immunity. Kettering's Memorandum at 2; UMCC's Memorandum at 1; CHSD's Memorandum at 1–2. UMCC also asserts state action immunity derivative of its associated state university's Eleventh Amendment immunity. UMCC's Memorandum at 1–2.

Federal courts have historically provided for recognizing university and professional education as a function of state government. *Daniel, supra,* at 161 (citing *Skehan v. State System of Higher Education,* 815 F.2d 244, 248 (3d Cir.1987)). Immunity to the states from legal action is pursuant to the Eleventh Amendment which provides:

> "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or

Citizens or subjects of any Foreign State."

U.S. Const. amend. XI.

 This Eleventh Amendment immunity extends to entities created by state governments operating as instrumentalities of the state. *Hess v. Port Authority Trans-Hudson Corporation,* 513 U.S. 30, 30–31, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994); *Lake Country Estates, Inc. v. Tahoe Regional Planning Agency,* 440 U.S. 391, 401, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979). If available, Eleventh Amendment immunity defeats a district court's jurisdiction over the subject matter at issue. *Hale v. Mann,* 219 F.3d 61, 67 (2d Cir. 2000) (citing *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 72–73, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)) (the Eleventh Amendment "restricts the judicial power under Article III").

 Whether Eleventh Amendment immunity extends to a particular governmental body depends on

> the degree of control and supervision over the entity, including the state's power of appointment and removal of officers or directors, any authority to approve or disapprove the actions of the entity, including its capacity to raise revenue for its own purposes, whether the entity is financially independent from the state, whether the state is responsible for the entity's obligations and liabilities, and the character of its functions, *i.e.,* state-wide or local, are performed or served by the entity.

*Daniel, supra,* at 151–52 (citing cases; footnotes omitted).

 Eleventh Amendment immunity is available only where the state is found to be the real party in interest. *Ford Motor Company v. Department of Treasury,* 323 U.S. 459, 464, 65 S.Ct. 347, 89 L.Ed. 389 (1945). When the factors considered in

deciding whether Eleventh Amendment immunity attaches point in different directions, the Eleventh Amendment's two purposes provide the primary guidance, *i.e.,* preventing threats to the state's dignity by requiring the entity to defend suit in federal court, and avoidance of federal court judgments which must be paid out of the state's coffers. *Hess, supra,* at 47–48, 115 S.Ct. 394. Because no one factor is dispositive in determining whether an entity, including a state university, is entitled to Eleventh Amendment immunity, and as each state university's existence is based on an individual state's governmental structure, the applicability of Eleventh Amendment immunity must be considered based on a particular state university's own peculiar legal relationship to its respective state. *Hall v. Medical College of Ohio, at Toledo,* 742 F.2d 299, 302 (6th Cir.1984), *cert. denied,* 469 U.S. 1113, 105 S.Ct. 796, 83 L.Ed.2d 789 (1985).

 According to the state action immunity doctrine, states acting in their sovereign capacities are exempt from federal anti-trust laws. *Parker v. Brown,* 317 U.S. 341, 351, 63 S.Ct. 307, 87 L.Ed. 315 (1943)(holding that as Sherman Act is directed against individual rather than state action, state regulatory programs could not be held to violate it). Derived from the nation's federal system, the state action doctrine provides that conduct on behalf of the state which is no more than simply intrastate regulation is beyond the reach of the Sherman Act. *California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.,* 445 U.S. 97, 103, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980). In particular, "[i]n a dual system of government in which, under the Constitution, the states are sovereign, save only as Congress may constitutionally subtract from their authority, an unexpressed purpose to nullify a state's control over its officers and agents is not lightly to be attributed to Congress." *Parker, supra,* at 351, 63 S.Ct. 307. To

qualify for this exemption from the anti-trust laws, a defendant must demonstrate either that it is the state acting in its sovereign capacity, or that it is acting pursuant to a "clearly articulated and affirmatively expressed state policy." *Hoover v. Ronwin,* 466 U.S. 558, 568–69, 104 S.Ct. 1989, 80 L.Ed.2d 590, *reh'g denied,* 467 U.S. 1268, 104 S.Ct. 3564, 82 L.Ed.2d 865 (1984).

In this case, to obtain state action immunity, Moving Defendants must present sufficient evidence demonstrating the lack of any material issue of genuine fact disputing that their participation in the relevant emergency medicine residency training programs constitutes action pursuant to clearly articulated state policy actively supervised by state officials. *Zanghi, supra,* at 47. As stated, however, although this court has already determined that San Diego Medical Center is shielded from anti-trust liability for the alleged unlawful conduct under both the state action immunity doctrine and Eleventh Amendment immunity, neither WSUSOM nor UACM are named as Defendants in this case. Report and Recommendation filed January 16, 1996 (Docket Item No. 435) at 69 (Eleventh Amendment), and 115–16 (state action); *Daniel, supra,* at 171, 189. Accordingly, the court first considers whether WSUSOM would be entitled to state action immunity and whether UACM would be entitled to either Eleventh Amendment or state action immunity had they been sued as defendants. The court then considers whether Kettering, UMCC and CHSD are entitled to state action immunity as an extension of their respective associated state university's Eleventh Amendment or state action immunity. Provided Moving Defendants demonstrate that the actions challenged in this case were taken by them as private parties acting at the direction of state officials or agencies, Moving Defendants may be entitled to the same "state

action" or Eleventh Amendment antitrust immunity that applies to those officials or agencies. *Southern Motor Carriers Rate Conference, Inc. v. United States,* 471 U.S. 48, 56–57, 105 S.Ct. 1721, 85 L.Ed.2d 36 (1985) (holding that limiting state action immunity to public officials' actions would frustrate congressional purpose by preventing a state from implementing programs restraining competition among private parties because "[a] plaintiff could frustrate any such program merely by filing suit against the regulated private parties rather than the state officials who implement the plan.").

■ To establish that state action immunity applies to a private party's actions, the private party must meet both prongs of a two-pronged test. *Southern Motor Carriers Rate Conference, Inc., supra,* at 62, 105 S.Ct. 1721. "First, the challenged restraint must be 'one clearly articulated and affirmatively expressed as state policy'; second, the policy must be 'actively supervised by the State itself.'" *Midcal Aluminum, Inc., supra,* at 105, 100 S.Ct. 937 (quoting *City of Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 410, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978)).

■ As to the first prong, that the challenged conduct must be pursuant to a "clearly articulated" state policy to qualify for state action immunity does not require that the anticompetitive conduct be compelled by the state. *Southern Motor Carriers Rate Conference, Inc., supra,* at 61, 105 S.Ct. 1721. Nor need "a specific, detailed legislative authorization" permit the challenged conduct. *Id.* at 64, 105 S.Ct. 1721 (quoting *Lafayette v. Louisiana Power & Light Co.,* 435 U.S. 389, 415, 98 S.Ct. 1123, 55 L.Ed.2d 364 (1978)). Instead, the

absence of legislative compulsion will not negate a claim of state action immunity provided evidence clearly demonstrates the state's intention "to displace competition in a particular field with a regulatory structure." *Southern Motor Carriers Rate Conference, supra,* at 62, 105 S.Ct. 1721. The second prong requires state supervision of the challenged conduct to realistically assure "that a private party's anticompetitive conduct promotes state policy, rather than merely the party's individual interests." *Patrick v. Burget,* 486 U.S. 94, 101, 108 S.Ct. 1658, 100 L.Ed.2d 83 (1988). The party asserting state action immunity, which is generally treated as an affirmative defense, bears the burden of its proof. *Federal Trade Commission v. Ticor Title Insurance Company,* 504 U.S. 621, 625, 112 S.Ct. 2169, 119 L.Ed.2d 410 (1992); *Town of Hallie v. City of Eau Claire,* 471 U.S. 34, 38–39, 105 S.Ct. 1713, 85 L.Ed.2d 24 (1985); *Patrick, supra,* at 94, 108 S.Ct. 1658.

The court discusses whether any of the Moving Defendants are entitled to state action immunity.

### 1. *Kettering Medical Center*

■ As stated, Kettering maintains that it does not sponsor a residency program of its own in emergency medicine, although it participates in an emergency medicine residency program sponsored by WSUSOM which is not a defendant to this action. As such, the court first examines whether WSUSOM, if it were a defendant to this action, would be entitled to state action immunity before considering whether such immunity would extend to Kettering.[6]

---

**6.** A plain reading of Kettering's papers demonstrates Kettering does not assert protection from liability based on an extension of Eleventh Amendment immunity which would protect WSUSOM from liability if WSUSOM

were a defendant to this action. Accordingly, the court does not consider the applicability of Eleventh Amendment immunity to either WSUSOM or Kettering.

In support of summary judgment, Kettering submits affidavits from the Chair of WSU's Department of Emergency Medicine, Glenn C. Hamilton, M.D. (Docket Item No. 779) ("Dr. Hamilton Affidavit"), and Kettering's Treasurer, Nehemias Velasco (Docket Item No. 780) ("Velasco Affidavit"). These affidavits establish that Kettering does not operate its own emergency medicine residency program but, rather, only permits WSUSOM emergency medicine residents to use Kettering's medical facilities to gain clinical experience in that field.

WSU, located in Fairborn, Ohio, near Dayton is a state-supported university established by the General Assembly of the State of Ohio pursuant to Ohio Revised Code Chapter 3352 and is governed by a statutorily-created board of eleven trustees. Dr. Hamilton Affidavit, ¶ 3; OHIO REV. CODE ANN. § 3352.01 (West 1973) (" § 3352.01"). Two of the trustees are WSU students, while the other nine trustees are appointed by the Governor of Ohio. § 3352.01(A). In 1974, the WSU Board of Trustees, pursuant to statute, created WSUSOM as an academic unit of WSU, in cooperation with Miami University of Ohio ("Miami") and Central State University of Ohio ("Central State"). Dr. Hamilton Affidavit, ¶ 4; OHIO REV. CODE ANN. § 3352.06 (West 1974). Miami and Central are also state-sponsored universities established by Ohio's General Assembly. OHIO REV. CODE ANN. §§ 3339.01 (Miami) and 3343.01 (Central State) (West 1953). The Boards of Trustees of WSU, Miami and Central State maintain broad control of WSUSOM as they are authorized to "make and enter into all contracts and agreements necessary or incidental to the operation of the college [WSUSOM]." OHIO REV. CODE ANN. § 3352.06 (West 1974).

WSUSOM is accredited by the Liaison Committee of Medical Education. Dr. Hamilton Affidavit, ¶ 4. In 1978, WSU-SOM created the Emergency Medicine departmental division which became a separate department in 1980, with Dr. Hamilton assuming its Chair in 1981. Dr. Hamilton Affidavit, ¶ 4. As Chair of WSUSOM, Dr. Hamilton is responsible for the overall operations of the Emergency Medicine Department. *Id.* In 1978, WSUSOM established WSUSOM's Integrated Residency in Emergency Medicine as an accredited emergency medicine residency training program, adopting the accreditation requirements available at that time as its residency program requirements, and it has been operated, administered and actively supervised as an accredited program since its inception. Dr. Hamilton Affidavit, ¶ 6. When ABMS granted Emergency Medicine specialties status in 1979, graduate medical training programs in emergency medicine came under ACGME's accrediting structure. *Id.* Since that time, accreditation requirements for emergency medicine residency programs have been promulgated by ACGME with RRC–EM evaluating emergency medicine residency programs. *Id.* WSUSOM's Integrated Residency in Emergency Medicine program has been fully accredited by RRC–EM since 1981. *Id.*

This record demonstrates that the Ohio legislature authorized WSU's Board of Trustees, in conjunction with the Boards of Trustees of Miami and Central State, to create WSUSOM, including the ability to "make and enter into all contracts and agreements necessary or incidental to the operation of the college." OHIO REV. CODE ANN. § 3352.06 (West 1974). This enabling statute is sufficiently broad to allow WSUSOM to set the standards required for physicians to teach residents in the Emergency Medicine Department. The requirement that such physicians be board certified in the relevant specialty is a reasonably foreseeable consequence of the

legislature's broad delegation of power. *Daniel, supra,* at 186 (citing *Cine 42nd Street Theater Corp. v. Nederlander Organization, Inc.,* 790 F.2d 1032, 1042, 1047 (2d Cir.1986)). Accordingly, the legislature's authorization constitutes a clearly articulated state policy. *Daniel, supra,* at 186.

As a result of the legislative grant of authority to WSU's Board of Trustees, the implementation of a requirement that physicians who teach residents in the Emergency Medicine department be ABEM certified was thus a foreseeable consequence and WSUSOM would, if sued as a defendant in this action, be protected from liability based on state action immunity. The court thus considers whether such state action immunity extends to Kettering.

The affidavits of Dr. Hamilton and Mr. Velasco establish that Kettering does not operate its own emergency medicine residency program but, rather, merely permits WSUSOM to use its facilities to provide its residents in emergency medicine with clinical experience. In particular, Kettering has never operated a medical school and the emergency medicine residency program at Kettering was established and is operated and supervised by WSU through WSUSOM. Velasco Affidavit, ¶ 7. Kettering and six other area hospitals participate in WSUSOM's Integrated Residency in Emergency Medicine by serving as clinical locations for functions performed by WSUSOM faculty and others authorized to teach the program residents in a patient care setting. Dr. Hamilton Affidavit, ¶ 9.

Kettering is a not-for-profit corporation incorporated under the laws of Ohio and engaged in providing medical services to patients in and around the Dayton metropolitan area. Velasco Affidavit, ¶ 3. At all times relevant to this action, Kettering has operated two general acute care medical and surgical hospitals, including the Charles F. Kettering Memorial Hospital located in Kettering, Ohio, and the Sycamore Hospital, in nearby Miamisburg, Ohio. *Id.* Each of these hospitals has an emergency department ("the emergency medicine departments") and provides short-term in-patient care for persons with acute illnesses or injuries. *Id.,* ¶ 4. WSUSOM's department of emergency medicine and Integrated Residency in Emergency Medicine headquarters are located in a building owned by WSU, on land situated next to Kettering's hospital facilities and other buildings in Kettering, Ohio. Velasco Affidavit, ¶ 8.

Kettering, since 1978, has contracted with Emergency Medicine Specialists, Inc., ("EMS"), an independent medical corporation neither owned nor controlled by Kettering or any Kettering affiliate, to staff Ketterings' emergency medicine departments with physicians. Velasco Affidavit, ¶ 5. The current contract between Kettering and EMS is dated February 28, 1985 and amended on January 1, 1990 ("the current contract"). *Id.* Previously, similar contracts dated September 28, 1984, February 16 and 20, 1981 and December 14, 1978 were in effect. *Id.*[7]

Under the current contract, EMS is an independent contractor to Kettering, obligated to provide full emergency physician services to patients seeking care at the emergency departments and is responsible for recruiting, hiring, training, supervising, compensating, providing benefits, promoting and retaining EMS physicians. Velas-

---

**7.** Copies of the current contract and the February 28, 1995 contract are attached respectively as Exhibits A and B to the Velasco Affidavit. Kettering is unable to locate copies of the February 16 and 20, 1981 and December 14, 1978 contracts, but maintains the terms of the earlier contracts are substantially similar to the latter contracts. Velasco Affidavit, ¶ 5.

co Affidavit, ¶ 6. EMS is also responsible for patient billings and collections as to services rendered by the emergency departments. The physicians provided by EMS may apply to Kettering for medical staff privileges and such applications are accepted or denied according to criteria applicable to all applicants. *Id.* The terms of the September 24, 1984 contract provide likewise. *Id.* The copies of the current and 1984 contracts provided by Kettering are consistent with these assertions.

WSUSOM, rather than Kettering, operates, administers, and actively supervises WSUSOM's Integrated Residency in Emergency Medicine. Dr. Hamilton Affidavit, ¶ 8. WSUSOM is responsible for and performs that day-to-day decision making and operational functions of the program. *Id.* The WSU Board of Trustees, either directly or through a WSUSOM group to which it has delegated authority, establishes the categories of faculty membership, determines the qualifications for faculty membership and appoints the faculty for WSUSOM residency programs, including for the Integrated Residency in Emergency Medicine. *Id.*

WSUSOM has actively supervised WSUSOM's Intergrated Residency in Emergency Medicine through a WSU-SOM-appointed Program Director since the program's inception in 1978. Dr. Hamilton Affidavit, ¶ 10. The Program Director is either the Chair of WSU-SOM's Department of Emergency Medicine, currently Dr. Hamilton, or appointed by the Chair. Dr. Hamilton Affidavit, ¶ 10; Interinstitutional Agreement, § 1. The Program Director is responsible for recruiting, appointing, assigning, and terminating residents, as well as supervising, directing and administering all educational activities and evaluating, accrediting and assuring that the program complies with other matters. *Id.* The hospital administration at Kettering, as well as at each of the other participating hospitals, appoints a Director of Medical Education which interacts as a liaison between the hospital and WSUSOM. *Id.* The Director of Medical Education, although a hospital employee, coordinates with WSUSOM's Program Director "to assure adherence to WSUSOM's Integrated Residency in Emergency Medicine and WSU policies, to monitor hospital institutional responsibilities, and to monitor compliance with accreditation requirements." Dr. Hamilton Affidavit, ¶ 10; see also Interinstitutional Agreement, § 1. The Director of Medical Education also consults with the Program Director regarding the assignment of residents to the participating hospitals to ensure that residents are assigned only to those hospitals that can offer the residents the anticipated educational opportunity. Interinstitutional Agreement, § 4. Nevertheless, WSUSOM wholly controls and exclusively and actively supervises faculty appointments for the emergency medicine residency program and faculty-associated matters, including faculty categories, qualifications, certifications whether by ABEM or some other board, appointments, assignments and duties. Dr. Hamilton Affidavit, ¶ 10.

As patients are not billed for resident services, Kettering has, since 1989–90, also served as the fiscal agent for WSUSOM's Integrated Emergency Medicine Residency Program to obtain reimbursement from the federal government for direct (*e.g.*, residents salaries), and indirect (*e.g.*, Medicare and Medicaid), expenses of a graduate medical program. Velasco Affidavit, ¶ 9; Dr. Hamilton Affidavit, ¶ 10. Kettering receives reimbursement for such expenses and, insofar as reimbursement is not received, seeks reimbursement from the responsible hospital. *Id.* Despite its involvement as a fiscal agent, Kettering does not direct the activities of any residents in WSUSOM's Integrated Residency in

Emergency Medicine, including those residents located at Kettering. *Id.*

The court finds these affidavits and exhibits establish that Kettering neither sponsors nor operates an emergency medicine residency program of its own and that its participation in WSUSOM's Integrated Residency in Emergency Medicine meets both prongs of the *Midcal* test for state action immunity to apply. Accordingly, Kettering is shielded from liability for the alleged anticompetitive activity.

Specifically, as to the first element, Kettering's involvement in WSUSOM's Integrated Residency in Emergency Medicine is limited to providing use of its facilities to WSUSOM, a program which the court has determined exists pursuant to clearly articulated state policy. All administrative and supervisory actions or policies pertaining to WSUSOM's Integrated Residency in Emergency Medicine program are dictated either by WSU's Board of Trustees, or by a WSUSOM group to which WSU's Board of Trustees has delegated authority, determines the categories of and qualifications for faculty membership and appoints faculty for the emergency residency program. Kettering's role as the fiscal agent for WSUSOM's Integrated Residency in Emergency Medicine does not vest Kettering with any authority as to faculty membership, qualifications or requirements. On this record, the court finds Kettering's participation in WSUSOM's Integrated Residency in Emergency Medicine is pursuant to a clearly articulated state policy.

As to the second element, Dr. Hamilton, as Chair of WSUSOM's Integrated Residency in Emergency Medicine, either acts as or appoints a Program Director who is authorized to oversee and organize the activities of the educational program. The Program Director is permitted to participate in institutional policy-making to the extent necessary to assure proper implementation of the emergency residency program. Although Kettering interacts with WSUSOM with regard to the residency program through a liaison known as the Director of Medical Education who is a hospital employee, the functions of the Director of Medical Education's include coordinating with the Program Director to assure adherence to WSUSOM's Integrated Residency in Emergency Medicine and WSU policies, monitoring hospital institutional responsibilities, and monitoring compliance with accreditation requirements. This record sufficiently demonstrates that WSUSOM, rather than Kettering, actively supervised WSUSOM's Integrated Residency in Emergency Medicine.

Kettering has thus sustained its burden of demonstrating that it is entitled to summary judgment based on state action immunity. The court next examines whether Plaintiffs have demonstrated the existence of a genuine issue of material fact sufficient to defeat summary judgment.

Plaintiffs assert in opposition to summary judgment that WSUSOM confirmed in its response to Plaintiffs' subpoena that the State of Ohio imposes no requirements on either WSUSOM or Kettering regarding the standards for hiring emergency physicians. Fitzgerald Affidavit, ¶ 4 (citing March 23, 2001 Letter of Gwen M. Mattison, General Counsel to WSU, to Mary C. Fitzgerald ("Mattison Letter"), Responsive to Nos. 3 and 4, Exhibit A to Fitzgerald Affidavit). According to Plaintiffs, because the State of Ohio imposes no standards for the hiring of emergency physicians at WSUSOM or that board certification was one of those standards, Kettering's alleged anticompetitive conduct cannot be justified under the state action doctrine as pursuant to clearly articulated state policy. Fitzgerald Affidavit, ¶ 5.

Kettering advances three arguments in opposition to these assertions. Kettering first argues that the Mattison Letter is

inadmissible as evidence in opposition to summary judgment because it is not a sworn statement. There is, however, no requirement that the evidence submitted in opposition to summary judgment be admissible as evidence at trial. Rather, the requirement is that the information be reducible to admissible evidence sufficient to carry Plaintiffs' burden of proof at trial. *Catrett, supra,* at 327, 106 S.Ct. 2548. The cases cited by Kettering in support of its argument that only evidence that would be admissible at trial may be considered in determining a motion for summary judgment, Kettering's Supplemental Memorandum at 5, are inapposite. Specifically, in *Trustees of the Nat'l Automatic Sprinkler Industry Pension Fund v. Fairfield Co. Sprinkler Co.,* 243 F.3d 112, 118 (2d Cir. 2001), the Second Circuit's only reference to the admissibility of evidence in opposition to summary judgment is the statement that "[s]ummary judgment is proper only if the admissible evidence establishes that 'there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Nat'l Automatic Sprinkler, supra,* at 118 (quoting Fed.R.Civ.P. 56(c)). Significantly, the court in *Nat'l Automatic Sprinkler* does not state that the phrase "admissible evidence" requires that in opposing summary judgment, the evidence must be presented to the court in a form that would be admissible at trial. In *Howley v. Town of Stratford,* 217 F.3d 141, 155 (2d Cir.2000), the Second Circuit considered whether statements made by the plaintiff in an affidavit would be admissible as evidence at trial, or would be excluded as hearsay as not made based on personal knowledge. The Second Circuit thus was considering whether the information contained in the affidavit could be considered in opposing summary judgment based on whether the content of the statements would be admissible at trial, rather than the form of the statements. Finally, the

Second Circuit's statement in *Raskin v. Wyatt Co.,* 125 F.3d 55, 66 (2d Cir.1997) that "[i]t is appropriate for district courts to decide questions regarding the admissibility of evidence on summary judgment," is consistent with the Supreme Court's requirement that evidence submitted on a summary judgment motion may be considered only if it may be reduced to admissible evidence sufficient to satisfy the party's burden of proof at trial. In other words, on summary judgment, the district court may decide whether the evidence submitted is in a form that would be admissible at trial, or whether the evidence advanced to show the existence of material issues of fact could be reduced to admissible form at trial. In the case at bar, the responses to Plaintiffs' subpoena contained in the Mattison Letter could be reduced to admissible form at trial if Mattison were to take the stand and testify that the responses were based on her own personal knowledge. As such, the court will consider the Mattison Letter as evidence submitted in opposition of summary judgment.

Nonetheless, Plaintiffs' assertions are without merit under Kettering's second and third arguments. In particular, Subpoena Question No. 3 seeks documents relating to the requirements for the hiring of emergency physicians at WSUSOM. Kettering, however, asserts that WSUSOM does not hire emergency physicians but, rather, faculty to teach emergency medicine to students. Further, Subpoena Question No. 4, seeking documents relating to the requirements for the hiring of emergency physicians at Kettering are not relevant as the standards at issue are those pertaining to WSUSOM's hiring of faculty for WSUSOM's Integrated Residency in Emergency Medicine. Subpoena Questions Nos. 3 and 4 thus seek information not relevant to the issue at hand.

Kettering further contends, correctly, that Subpoena Questions Nos. 3 and 4 are misdirected as the requirements for ABEM certification for the WSUSOM Integrated Residency in Emergency Medicine are part of WSUSOM policy and those who teach in that residency program, including those based at Kettering, are subject to these requirements. Kettering Supplemental Memorandum at 6–7. In support of that position, Dr. Hamilton explains that ABEM certification is a requirement imposed on its Integrated Residency in Emergency Medicine program faculty. Dr. Hamilton Affidavit, ¶ 4. Kettering submits in support of this assertion the written Interinstitutional Agreement between WSUSOM and Kettering governing the Integrated Residency Program in Emergency Medicine ("the WSUSOM–Kettering Agreement").[8] The WSUSOM–Kettering Agreement specifically provides that "[i]t is the intent of this agreement to maintain full conformity with the current "Essentials of Accredited Residencies in Graduate Medical Education," as stated in the General Requirements for all programs and in the Special Requirements for Residency Training in Emergency Medicine." WSUSUM–Kettering Agreement, at 1. In other words, the WSUSOM–Kettering Agreement provides that the Integrated Residency Program in Emergency Medicine will conform with ACGME's general accreditation requirements, including ABEM's specific accreditation requirements for emergency medicine residency training.

Further, the court's determination that Ohio Rev. Code Ann. § 3352.06, authorizing the creation of WSUSOM, including the ability to "make and enter into all contracts and agreements necessary or incidental to the operation of the college" is sufficiently broad to allow WSUSOM to require that only board certified physicians may teach residents in the Emergency Medicine Department, Discussion, *supra*, at 19–20, supports finding that board certification was specifically required by Ohio to establish that the hiring of emergency physicians was pursuant to state action. This finding is consistent with the court's previous finding that University of Massachusetts Medical Center ("the Massachusetts Medical Center") was entitled to immunity based on the state action doctrine where enabling legislation established that the Massachusetts UMCC's "purpose was to provide 'public service, research, and educational programs' in professional areas which require more than an undergraduate education, such as medicine." *Daniel, supra*, at 191 (quoting Mass. Gen. L. ch. 75, § 2). Significantly, the court did not find that the Massachusetts legislature directly imposed board certification as a requirement for employment of physicians who practice and teach at the Massachusetts Medical Center. *Daniel, supra*, at 191.

Plaintiffs also argue that discovery reveals that the Integrated Residency Program in Emergency Medicine program director is not employed exclusively by WSU but, rather, also receives compensation from University Medical Services Associates. Fitzgerald Affidavit, ¶ 6. Plaintiffs assert that the program director's dual employment status creates an issue of fact as to whether the residency program is being administered pursuant to a clearly articulated and affirmatively expressed state policy, as compared to the policies of a private party. Fitzgerald Affidavit, ¶¶ 7–8 (citing January 20, 2000 Report and Recommendation, Docket Item No. 751, at

---

8. A copy of the WSUSOM–Kettering Agreement is attached as Exhibit A to Dr. Hamil- ton's Affidavit.

40). However, Plaintiffs have incorrectly cited this court's earlier Report and Recommendation regarding Defendant OLM's support for summary judgment, Docket Item No. 751 in support of their argument. Specifically, this court found that although state action immunity can apply to a private party, a genuine issue of material fact existed as to whether Defendant Our Lady of Mercy's participation in New York Medical Center's emergency medicine program constituted state action as the emergency medicine residency program director was an employee of New York Medical Center, a private non-profit corporation. In contrast, in the instant case the program director is employed by WSU to "assure adherence to WSUSOM's Integrated Residency in Emergency Medicine and WSU policies." Dr. Hamilton Affidavit, ¶¶ 1, 10. That the program director may receive some funding from another source does not change the program director's job responsibilities. As such, this argument fails to defeat summary judgment.

Nor is there any merit to Plaintiffs' assertion that Kettering "controls which residency program faculty may practice at its hospital facilities because its medical executive committee and board of trustees controls the standards for hiring or granting medical staff privileges to emergency physicians," thus defeating the *Midcal* supervision element to support state action immunity. Fitzgerald Affidavit, ¶ 10. Kettering, however, does not hire the emergency medicine physicians who occupy faculty positions within WSUSOM's Integrated Residency in Emergency Medicine; rather, WSUSOM is responsible for establishing the qualifications for the faculty of WSUSOM's Integrated Residency in Emergency Medicine, as well as appointing physicians for those faculty positions. Dr. Hamilton Affidavit, ¶ 8. Therefore, even if, as Plaintiffs maintain, all such faculty positions must be occupied by an ABEM certified physician, that re-

quirement is imposed by WSUSOM, a state agency, *id.*, rather than Kettering.

Therefore, none of Plaintiffs' contentions demonstrates the existence of material issues of fact going to the question whether Kettering's involvement in the WSUSOM emergency medicine residency program is pursuant to a state policy under active state supervision.

Plaintiffs have thus failed to raise a genuine issue of material fact sufficient to defeat summary judgment. Accordingly, Kettering's motion for summary judgment should be GRANTED.

### 2. *University Medical Center (Tucson)*

UMCC also maintains that it does not sponsor a residency program of its own in emergency medicine but, rather, participates in an emergency medicine residency program sponsored by UACM which is not a defendant to this action. As such, the court first examines whether UACM, if it were a defendant to this action, would be entitled to either Eleventh Amendment or state action immunity before considering whether such immunity would entitle UMCC to state action immunity.

To determine whether Eleventh Amendment immunity applies to UACM, Arizona statutory law, the bylaws of U of A and the bylaws of UACM must be reviewed. "When an action is brought against an entity or institution claiming immunity under the Eleventh Amendment, application of the amendment turns on whether the entity can be characterized as an arm of the state, or whether it should be treated as a non-immunized political subdivision of the state." *Daniel, supra,* at 155 (citing *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). Further, the assertion of Eleventh Amendment immunity goes to this court's subject

matter jurisdiction. *Hale v. Mann,* 219 F.3d 61, 67 (2d Cir.2000) (citing *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 72–73, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996)) (the Eleventh Amendment "restricts the jurisdictional power under Article III.").

Because Plaintiffs originally had no opportunity to conduct discovery pertaining to the state of Arizona's alleged control of UACM such that UACM would be protected from liability in the instant case if sued as a defendant, Plaintiffs were granted a period of discovery toward that end. In their subsequent submissions, however, Plaintiffs do not develop their argument that Eleventh Amendment immunity does not apply to UACM but, rather, argue only that the discovery demonstrates that UMCC is not entitled to state action immunity, Fitzgerald Affidavit, ¶ 14, and UMCC thus argues that Plaintiffs have conceded that UACM is protected by state action immunity. UMCC's Supplemental Reply at 1. Nevertheless, the court considers whether the evidence demonstrates that, as a matter of law, UACM is protected from liability based on Eleventh Amendment immunity.

Here, the record and relevant law demonstrate that UMCC does not exist and operate pursuant to the authority of UACM but, rather, both UMCC and UACM exist and operate pursuant to the authority of the Arizona Board of Regents ("the ABOR"), rather than UACM. Indeed, nothing within Arizona's statutory scheme relative to these entities indicates that the state of Arizona retains the degree of control and supervision over UACM necessary to find that an action against UACM is, in reality, an action against the state. Arizona law provides that UACM's director and governing board are appointed by ABOR, ARIZ. REV. STAT. § 15–1643.A, C and D. The director is required to submit an annual report to the governor and both houses of the state legislature regarding UACM's fiscal status, education, outreach and training programs, health care personnel placement, assessment of system accomplishments and recommendations for possible legislative action, ARIZ. REV. STAT. § 15–1643.E, and the governing board oversees physician education programs, including programs at the graduate and postgraduate levels. ARIZ. REV. STAT. § 15–1643.C and D

Nevertheless, it is unclear precisely what level of control, if any, the state, acting through UACM, retains over the director and board, such as under which circumstances the director or board members may be removed. *Id.* Significantly, it is not clear whether UACM is financially independent from the state, whether the state is liable for UACM's obligations and liabilities, or whether UACM may raise revenue for its own purposes. *See Daniel, supra,* at 151–52. It is thus not possible to find, based on this record, that a suit against UACM would, in essence, be a suit against the state as required for Eleventh Amendment immunity to attach. *Ford Motor Company, supra,* at 464, 65 S.Ct. 347.

Accordingly, UMCC has not demonstrated that UACM would, if made a defendant to this action, be protected from liability based on Eleventh Amendment immunity. For essentially the same reasons, UMCC has also failed to demonstrate that UACM would be entitled to state action immunity. As such there is no need to determine whether UMCC would be protected from liability based on state action immunity derived from either the Eleventh Amendment or state action immunity of UACM.

 There is, however, sufficient evidence in the record establishing that UMCC may derive state action immunity from the ABOR. Notably, the ABOR has

been held by the Ninth Circuit to be entitled to Eleventh Amendment immunity. See *Rutledge v. Arizona Board of Regents*, 660 F.2d 1345 (9th Cir.1981), and *Ronwin v. Shapiro*, 657 F.2d 1071 (9th Cir.1981).[9] Moreover, as Eleventh Amendment immunity raises a question of subject matter jurisdiction, the court *sua sponte* considers whether UMCC is, in the alternative, eligible for state action immunity based on ABOR's Eleventh Amendment immunity.

As discussed, federal courts have held that ABOR is a state agency entitled to Eleventh Amendment immunity and this court agrees with that finding. Specifically, U of A was created as a state educational institution for higher education by the Arizona legislature. ARIZ. REV. STAT. § 15.1601(A) (1991). The Arizona legislature created the ABOR to govern the U of A. ARIZ. REV. STAT. §§ 15.601, 15–1625, and 15–1626(A). The ABOR is comprised the Governor of Arizona and Arizona's Superintendent of Public Instruction, and nine additional members appointed by the Governor, seven of whom serve eight year terms and must be confirmed by the State Senate. ARIZ. REV. STAT. §§ 15–1621.A, B and C, and 38–211. The remaining two appointed members are student members, each serving a two year term. ARIZ. REV. STAT. § 15–1621.B.

The Arizona Legislature has granted the ABOR broad authority to act in furtherance of Arizona's state universities and other educational institutions, including the ability to make contracts and to sue and be sued, ARIZ. REV. STAT. § 15–1625.B.2 and 3, the authority to purchase, lease and sell real property, to accept grants, subsidies or borrow money from federal agencies, to borrow money and issue bonds to acquire any project or combination of projects, to make contracts and leases and to execute instruments and perform acts necessary or convenient to fulfill the powers granted by the legislature. ARIZ. REV. STAT. §§ 15–1682.2, 4 and 5, 15–1683, 15–1691 and 15–1692.

The ABOR is required to submit an annual report for the relevant fiscal year to the governor, setting forth the universities' progress as to their colleges, schools, departments, courses of study, faculty and staff, as well as the number of students enrolled, receipts and expenditures and any other information deemed proper by the ABOR. ARIZ. REV. STAT. § 15–1629. Members of the ABOR are immune from personal liability as to all actions taken in good faith within the scope of their authority during meetings with the approval of the majority of the board. ARIZ. REV. STAT. § 15–1621.E.

ABOR is granted all power necessary to effectively govern and administer the institutions under its control, including, *inter alia*, to adopt and authorize each institution to adopt necessary regulations, policies, rules or measures and also to delegate such authority to its committees, university presidents or designees and other entities under its control. ARIZ. REV. STAT. § 15–1626.A.1. ABOR is authorized to appoint and employ and determine the compensation of the universities' presidents, vice-presidents, faculty and other officers and employees, ARIZ. REV. STAT. § 15–1626.A.2 and 3, and to remove any such officer or employee when the interests of the state's education so requires. ARIZ. REV. STAT. § 15–1626.A.4. Although ABOR is authorized to fix tuition

9. UMCC mistakenly relies on *Rutledge, supra,* and *Ronwin, supra,* for the proposition that U of A is entitled to Eleventh Amendment immunity. *See* UMCC's Memorandum at 10–11. However, both these cases provide only that ABOR is protected by Eleventh Amendment immunity. As such, those cases do no bear on whether UACM is similarly protected from Eleventh Amendment immunity.

and fees to be charged at the institutions, the exercise of that power is dependent on ABOR's provision for public hearings and disclosure to permit comments from students and the public. ARIZ. REV. STAT. § 15–1626.A.5(a),(b) and (c). Furthermore, public ABOR action on changes in tuition or fees is to be taken by roll call vote. ARIZ. REV. STAT. § 15–1626.A.5(d). An annual budget for each institution must be submitted by ABOR to the state legislature. ARIZ. REV. STAT. § 15–1626.-A.6. ABOR is authorized to establish curricula and designate courses at the institutions which "will best serve the interest of this state," ARIZ. REV. STAT. § 15–1626.A.7, to award degree and diplomas upon the completion of such courses and curriculum requirements, ARIZ. REV. STAT. § 15–1626.-A.8, to set student admission standards, ARIZ. REV. STAT. § 15–1626.A.9, to employ attorneys as needed to address litigation concerns, ARIZ. REV. STAT. § 15–1626.A.11 and adopt personnel rules, ARIZ. REV. STAT. § 15–1626.B.

ABOR is required to maintain a separate permanent fund into which are to be deposited all funds derived from the lease, sale or other disposition of lands or property given by any person or by law as a trust fund, to be administered according to the terms of the gift. ARIZ. REV. STAT. § 15–1662.B. ABOR may borrow money and issue bonds to raise money to finance construction projects and for maintenance of buildings and facilities at the various institutions. ARIZ. REV. STAT. §§ 15–1682, 1501683.

▮ In light of the broad authority granted ABOR to create and maintain institutions of higher learning within the state of Arizona, the court finds that ABOR qualifies as a branch of Arizona's state government and, as such, is protected by Eleventh Amendment immunity. For essentially the same reasons, ABOR would also be entitled to state action im-

munity. The court next examines whether UMCC's relation with ABOR entitles it to state action immunity under the relevant two-pronged test, *i.e.*, whether the challenged activity is taken according to a clearly articulated and affirmatively expressed state policy and whether such activity is actively supervised by the state.

ABOR is legislatively mandated "to establish the Arizona health education system in the college of medicine of the university of Arizona," and to appoint a system director for the same. ARIZ. REV. STAT. § 15–1643.A. A governing board, appointed by ABOR, oversees physician education programs, including programs at the graduate and postgraduate levels. ARIZ. REV. STAT. § 15–1643.C and D. The director is required to submit an annual report to the governor and both houses of the state legislature regarding UACM's fiscal status, education, outreach and training programs, health care personnel placement, assessment of system accomplishments and recommendations for possible legislative action. ARIZ. REV. STAT. § 15–1643.E. ABOR is required to approve or disapprove any contract or agreement entered into by the U of A hospital with the Arizona health facilities' authority. ARIZ. REV. STAT. § 15–1626.D.

In the Affidavit of UMCC In–House Counsel James W. Richardson, Esq., attached as Exhibit A to UMCC's Notice of Motion for Summary Judgment ("Richardson Affidavit"), Richardson explains that under relevant Arizona law, the ABOR governs Arizona's three-public universities, including U of A—Tucson. Richardson Affidavit, ¶ 4. ABOR is an Arizona state agency. *Id.* In 1967, U of A, upon authorization by the Arizona Legislature, ARIZ. REV. STAT. § 15–1643, commenced operation of its College of Medicine, *i.e.*, UACM. *Id.*, ¶ 5.

In 1971, the University Medical Center, formerly known as "University Hospital", commenced operation as an adjunct of and the primary teaching hospital for UACM. Richardson Affidavit, ¶ 6. The University Hospital originally was operated under the control and functioned as a department of the U of A, was ultimately governed by the ABOR through its Health Sciences Subcommittee, and was accounted for as a separate fund account group within U of A. *Id.* University Hospital's operations were initially funded by patient revenues and specific annual appropriations directly from the Arizona State Legislature, which largely covered operating losses incurred by U of A in operating University Hospital. *Id.,* ¶ 7.

Changes in the health care environment in the early 1980s caused U of A and ABOR to consider how University Hospital could remain economically viable without increasing future legislative appropriations to unacceptable levels. Richardson Affidavit, ¶ 8. Specifically, because University Hospital was part of a governmental institution, it was subject to restrictions imposed by state statutes and regulations in contracting with vendors, health maintenance organizations, preferred provider organizations and other third party health care reimbursement plans. *Id.* University Hospital also could not enter into joint ventures and other economic affiliations and was dependent upon legislative appropriations for capital and operating funds as it existed in a bureaucratic environment that did not promote the efficient, competitive and economical operation of University Hospital. *Id.*

To address the situation, ABOR and U of A, in 1984, persuaded the Arizona Legislature to adopt new statutes permitting ABOR to lease and convey University

Hospital and related assets "to a nonprofit corporation which would operate University Hospital free from many of the obstacles noted above." Richardson Affidavit, ¶ 9. University Medical Center Corporation ("UMCC") was organized in 1984 to serve as the lessee and to operate the University Medical Center for UACM as authorized under the amended statutes, referred to as the "Act." ARIZ. REV. STAT. § 15–1637; Richardson Affidavit, ¶ 10. On November 9, 1984, the ABOR, U of A and UMCC entered into the Educational Agreement which provides, as relevant, that the University Medical Center exists for primarily two purposes, including (1) to support the educational and research activities of the UACM and (2) to provide quality health care services to the community. Educational Agreement, ¶ C [10]; Richardson Affidavit, ¶ 21. The Educational Agreement further authorizes the U of A president to develop and implement policies, guidelines and procedures regarding the number of, recruitment, selection and placement of persons for the residency programs at the University Medical Center. Educational Agreement at 5, § 3(B)(7); Richardson Affidavit, ¶ 21.

The Act provides that UMCC will be governed by a Board of Directors as provided for in the Act, and organized under articles of incorporation or bylaws ("the Bylaws") which have been approved by ABOR. Richardson Affidavit, ¶ 10. The Bylaws govern, *inter alia,* the distribution of UMCC's earnings, disposition of UMCC's assets upon dissolution or liquidation, amendment of the bylaws only upon ABOR's approval, and permit UMCC's Board of Directors to adopt nondiscriminatory rules and regulations regarding the terms of medical staff privi-

---

**10.** A copy of the November 9, 1984 Educational Agreement is attached as Exhibit 3 to

The Notice of Motion.

leges at the University Medical Center, regardless of whether such persons have faculty teaching positions at UACM, so long as such rules and regulations are sufficient to protect the educational and research purposes and goals of the University Medical Center. *Id.* UACM is required to reimburse UMCC for the costs UMCC incurs in supporting the teaching mission of UACM. Richardson Affidavit, ¶ 22 (citing Ancillary Contract between ABOR, UACM and UMCC, attached as Exhibit 4 to UMCC's Notice of Motion ("Ancillary Contract 1")).

Another ancillary agreement governs the agreement between UACM and UMCC regarding medical residents. Richardson Affidavit, ¶ 23 (citing Ancillary Contract between ABOR, UACM and UMCC, attached as Exhibit 4 to UMCC's Notice of Motion ("Ancillary Contract 2")). Notably, Ancillary Contract 2 provides that the UACM special program director shall be authorized to: (1) direct and coordinate the specialty educational programs, (2) appoint and counsel the UMCC teaching staff responsible for conducting the medical education program and supervise each program participant's patient care activities, (3) select and dismiss program participants, (4) establish program policies and procedures as to participant contact with patients and departmental activities, (5) attend to administrative details, and (6) manage resources. Richardson Affidavit, ¶ 23 (citing Ancillary Contract 2, § 3).

The University Medical Center is located in the Arizona Health Sciences Center complex near U of A's main campus. Richardson Affidavit, ¶ 24. Pursuant to its bylaws, Active members of the University Medical Center's staff include members of the voting or full-time faculty of the clinical departments of UACM. *Id.*, ¶ 25. Such UACM faculty members perform clinical activities, treat patients and are regularly involved in medical staff functions at the University Medical Center. *Id.*

The Arizona State Legislature appropriates clinical teaching support funds to UACM for each fiscal year and under the Educational Agreement, the U of A and UMCC negotiate to allocate a portion of the funds to reimburse UMCC for expenses and additional costs incurred by UMCC is fulfilling its role as UACM's primary teaching hospital. Richardson Affidavit, ¶ 26. UMCC in turn allocates a substantial portion of the funds to reimburse UACM for medical residents' compensation. *Id.*

All full-time members of UACM's emergency medicine clinical faculty are members of University Physicians, Inc. ("UPI"), a non-profit corporation organized under Arizona's general corporation laws and which has been determined an exempt organization under § 501(c)(3) of the Internal Revenue Code of 1986. Richardson Affidavit, ¶ 27. UPI is a fund account group through which a portion of the revenues generated by patient services provided by full-time members of UACM's clinical faculty are made available to supplement their faculty salaries. *Id.* All full-time members of UACM's emergency medicine clinical faculty are members of the University Medical Center's medical staff, belong to UPI and are contractually bound to provide patient care services exclusively through UPI. *Id.*, ¶ 28. Further, the physicians working in UMCC's emergency medicine department are not employed by UMCC but, rather, are employed by UPI and UACM where they teach and supervise resident physicians who are employed by UACM. *Id.*, ¶ 29. UMCC does not make hiring decisions or recruit physicians for UPI. *Id.*, ¶ 30.

Moreover, UMCC does not operate the emergency medicine residency program or any other graduate or undergraduate med-

ical education program with which it is affiliated. *Id.*, ¶ 31. As such, UMCC does not solicit medical students, interns or residents regarding its affiliated internships, residencies or clerkships. *Id.*, ¶ 32. Nor does UMCC advertise or promote UACM's residency and internship programs or clerkships. *Id.* UMCC also does not initiate correspondence with medical students concerning the residency program and it directs all substantive questions regarding the residency program to UACM. *Id.* Instead, UMCC participates in UACM's emergency medicine program merely by offering use of its facilities, including the University Medical Center, as a service to UACM's medical students and the public. *Id.*

Dr. Sam Keim, whose affidavit in support of UMCC's motion for summary judgment ("Dr. Keim Affidavit") is attached as Exhibit C to UMCC's motion for summary judgment, is employed by UACM as its Emergency Medicine Residency Program Director, having been appointed to that position in December 1989. Keim Affidavit, ¶ 1. As such, Dr. Keim is familiar with the operation and policies of UACM's residency programs. *Id.*

According to Dr. Keim, he is not employed by and receives no compensation from UMCC. Dr. Keim Affidavit, ¶ 3. As an employee of UACM and director of UACM's emergency medicine residency program, Dr. Keim is responsible for the program's general administration, selection, instruction, supervision, counseling, evaluation and the advancement of residents and maintenance of records regarding the program and its accreditation. *Id.* Dr. Keim is also responsible for ensuring that the emergency medicine residency program meets ACGME's educational objectives, appoints all residents at the University Medical Center and determines their rotations and assignments. *Id.*

The University Medical Center's medical staff consists primarily of physicians with full-time or associate appointments to UACM's clinical faculty, although faculty appointments are not required for such membership. Dr. Keim Affidavit, ¶ 4. Dr. Keim explains that the University Medical Center serves as the principal teaching hospital for UACM and that he, as well as most other UACM's faculty members, are also members of UMCC's medical staff. *Id.*, ¶ 5. UMCC's most significant relationship with U of A's five health colleges is that with UACM. *Id.* UACM's Clinical faculty department heads or their designees serve as clinical department heads or chiefs of service at the University Medical Center. *Id.* For the academic year 1999–2000, the University Medical Center accommodated 373 physicians enrolled in post-graduate medical education programs at UACM in 32 different fields, including 30 in emergency medicine. *Id.* UACM, rather than UMCC, selects from among the applicants to these programs and all residents, interns and fellows working at UMCC are employed by UACM, rather than by UPI or UMCC, although such residents, interns and fellows are trained and supervised by UPI physicians. *Id.*, ¶ 6.

UACM participates in the American Medical Associations Fellowship and Residency Electronic Interactive Database Access Program ("FREIDA"), which contains information pertaining to residency programs nationwide and which can be accessed by interested individuals throughout the country. Dr. Keim Affidavit, ¶ 8. Residents in the U of A's emergency medicine residency program rotate through four hospitals in the Tucson metropolitan area, including the University Medical Center, where residents typically spend 80 to 85 percent of their training given that the University Medical Center is the program's primary teaching hospital. *Id.*, ¶ 9.

Importantly, UMCC does not mandate that the physicians employed in its emergency medicine department be ABEM certified or eligible for ABEM certification. *Id.*, ¶ 11. Nor does UMCC require or request the physicians affiliated with or performing services at UMCC to belong to or participate in ABEM, CORD, ACEP or the Society for Academic Emergency Medicine ("SAEM"). *Id.*, 12. Dr. Keim does not recall that UACM or UMCC participated in any decisions or discussions with ABEM pertaining to the standards for ABEM certification in emergency medicine. *Id.*, ¶ 13.

The court finds this record establishes that the emergency medicine residency program at the University Medical Center meets both prongs of the *Midcal* test for state action immunity to apply, thereby shielding the University Medical Center from liability for the alleged anticompetitive conduct.

As to the first prong, Arizona's statutory scheme requires the ABOR to establish UMCC and also endows the ABOR with broad power to adopt standards, regulations and policies governing educational programs at the University Medical Center, including academic and admission requirements, advancement, credits and teaching credentials. ARIZ. REV. STAT. § 15-1626.A. Although UMCC does not require that emergency physicians at the University Medical Center be ABEM certified or eligible, ABOR's statutory control over UMCC establishes that UMCC's requirements and practices pertaining to physician appointments are pursuant to clearly articulated and affirmatively expressed Arizona policy, specifically, UMCC's Bylaws. The emergency medicine residency program operated by UMCC therefore exists and is operated pursuant to state policy, carried out by ABOR and UACM as arms of the state of

Arizona, thereby satisfying the first prong of the *Midcal* test.

As to the second prong, the record demonstrates that UMCC's operation of the emergency medicine residency program at the Medical Center is actively supervised by the state through UACM. Dr. Keim, a UACM employee appointed by the Dean of the UACM, is responsible for the UACM's emergency medicine residency program including recruiting, selecting, instructing, supervising, counseling, evaluation, and advancement of the programs' residents, interns and fellows. UMCC has, therefore, sustained its burden of proof as to the second prong.

Plaintiffs assert five arguments in attempting to defeat summary judgment and the court addresses each in turn. Plaintiffs first argue that UMCC is a non-profit corporation under § 501(c)(3) of the Internal Revenue Code and, as such, is a separate entity from the state and any policies or standards regarding the hiring of emergency physicians for UMCC are voluntarily established. Fitzgerald Affidavit, ¶ 15. However, that UMCC is a separate entity from the state and voluntarily participated in the administration of the emergency residency program is not relevant to whether the challenged action in which UMCC allegedly participated was undertaken pursuant to state law as a private party's actions "need not be compelled" to be protected from liability based on state action immunity. *See e.g., Southern Motor Carriers Rate Conference, supra,* at 61–64, 105 S.Ct. 1721 (holding that collective rate-making activity by private motor carriers was conduct taken pursuant to clearly articulated state policy as relevant state legislatures had expressly permitted such activity).

Second, Plaintiffs assert that because the Program Director receives compensation from both U of A and UPI for his

services with regard to UMCC's emergency medicine residency program, the Program Director does not function solely as a state employee. Fitzgerald Affidavit, ¶ 16. However, UPI provides additional salaries to UACM's clinical faculty only based on revenues generated by patient services provided by full-time members of UACM's clinical faculty. Richardson Affidavit, ¶ 27. Such funds thus are generated by state activity through employment arrangements with UACM.

Third, Plaintiffs maintain that UMCC has authority under the Ancillary Contracts governing the residency programs to appoint the program director for the emergency medicine residency program. Fitzgerald Affidavit, ¶ 17. The record establishes, however, that UMCC and UACM have, by contract, agreed to jointly select the Program Director. Ancillary Contract No. 2, § III.C. Accordingly, UMCC is not free to appoint the physician of its choice as program director; rather, the choice must be acceptable to both UMCC and UACM.

Fourth, Plaintiffs maintain that UMCC can refuse to grant medical privileges to faculty members of the residency program, thus negating the notion that UMCC's participation in the UACM emergency medicine residency program in not sufficiently supervised by the state to meet the *Midcal* test. Fitzgerald Affidavit, ¶ 18. UMCC does not dispute this assertion, but argues that UMCC, like other hospitals, separately and independently grants or denies medical staff membership and privileges to physicians. UMCC's Supplemental Memorandum at 3. UMCC, however, does not hire the emergency medicine physicians who occupy faculty positions within UACM's emergency medicine residency program but, rather, the requirements for

faculty positions in the emergency medicine residency program are established by UACM's special program director who also appoints physicians to fill the faculty positions. Richardson Affidavit, ¶ 23 (citing Ancillary Contract 2, § 3). Therefore, even if, as Plaintiffs maintain, all such faculty positions must be occupied by an ABEM certified physician, that requirement is imposed by UACM, *id.*, a state agency, rather than by UCMM. As such, Plaintiffs' fourth argument is without merit.

Finally, Plaintiffs make much of the fact that UMCC has at least two members sitting on the U of A Health Sciences Center's Graduate Medical Education Committee ("GMEC"), including UMCC's president and Chief Executive Officer and its Vice President for Medical Services. Fitzgerald Affidavit, ¶ 19. According to Plaintiffs, as the purpose of GMEC is to monitor and advise UACM on all aspects of the emergency medicine residency education program, UMCC's presence on the GMEC amounts to involvement and participation in policy-making, review and oversight of the emergency medicine residency program evidencing that the control and administration of the residency program is not determined exclusively by UACM and, thus, the state. *Id.*, ¶¶ 19–20. The purpose of the GMEC as stated in the GMEC's Charge to the Committee ("GMEC Charge")[11] is to monitor and advise on all aspects of residency education. GMEC Charge at 1. Significantly, the GMEC Charge does not provide that UMCC is authorized to insist that any advice given or recommendations made thereunder must be followed. *Id.* As such, the court does not find that UMCC's membership in the GMEC vests UMCC with

---

11. A copy of GMEC's Charge is attached as an exhibit to UMCC's Response to Plaintiff's Supplemental Interrogatories Regarding Immunity Defenses, a copy of which is attached as Exhibit F to the Fitzgerald Affidavit.

the type of control of the administration of the emergency medicine residency program sufficient to defeat state action immunity.

Plaintiffs have therefore failed to demonstrate the existence of a genuine issue of material fact sufficient to defeat summary judgment as to UMCC. Accordingly, summary judgment in favor of UMCC should be GRANTED.

### 1. *Children's Hospital (San Diego)*

██ CHSD asserts that is also · does not sponsor its own residency program in emergency medicine; instead, it participates in an emergency medicine residency program sponsored by University of California Medical Center at San Diego, CHSD's Memorandum at 1, which this court has already found is exempt from liability in this action based on Eleventh Amendment and state action immunity. *Daniel, supra,* at 171, 188–89. Specifically, the court found the University of California Medical Centers were entitled to Eleventh Amendment immunity because they are dependent on the Regents of the University of California ("the Regents") and the University of California in several key aspects of their existence and as the Regents is clearly an arm of the state. *Daniel, supra,* at 171. The University of California Medical Centers were also found to be entitled to state action immunity as they were established by the Regents "and granted the power to administer their day to day operations, including the responsibility for evaluating and approving policies regarding physician credentialling." *Id.* at 189. Furthermore, as "each of the medical centers was delegated authority by the Regents to develop a credentialling process, through the credentialling process the Regents likely envisioned health care and educational facilities with highly qualified medical staff." *Id.* Accordingly, the University of California's Medical Centers alleged anticompeti-

tive conduct was held to be taken pursuant to a clearly articulated state policy and those defendants were dismissed from this action. *Id.* at 171, 189.

In support of summary judgment, CHSD submits affidavits from the Medical Director of the Emergency Care Center of CHSD and Health Center Dr. Ian McCaslin ("Dr. McCaslin Affidavit"), CHSD's Medical Staff Services Team Leader Carolyn Burnham ("Burnham Affidavit"), and CHSD's Senior Vice President for Health Affairs Dr. Emanuel Kauder, respectively attached as Exhibits 1, 2 and 3 to CHSD's Notice of Motion, as well as Andrea Resnick, Esq., of counsel in the Health Law Section of the Office of the General Counsel, University of California ("Resnick Affidavit") (Docket Item No. 826). These affidavits establish that CHSD is entitled to state action immunity.

CHSD, a non-profit corporation organized and existing under the laws of California, operates a general acute care medical and surgical facility in San Diego, California. McCaslin Affidavit, ¶ 3; Kauder Affidavit, ¶ 3. CHSD neither owns nor operates a medical school or a residency program in any practice area, including emergency medicine. McCaslin Affidavit, ¶ 3; Kauder Affidavit, ¶ 8. In fact, CHSD first opened its emergency medicine department, the Emergency Care Center, on July 6, 1993, ten days before Plaintiffs filed the Second Amended Complaint. McCaslin Affidavit, ¶ 3; Kauder Affidavit, ¶ 8. Since opening the Emergency Care Center, CHSD has allowed emergency medicine resident physicians who have been accepted into an emergency residency program at the University of California—San Diego ("UCSD"), to rotate through CHSD's facilities to obtain broader clinical experience than they would otherwise gain when training at UCSD·alone. McCaslin Affidavit, ¶ 5.

The Regents is a state constitutional corporation owning and operating the University of California San Diego Medical Center ("UCSD Medical Center") and the University of California San Diego School of Medicine ("UCSD School of Medicine") (collectively, "UCSD"). McCaslin Affidavit, ¶ 5. Neither UCSD Medical Center nor UCSD School of Medicine are separately incorporated entities but, rather, are part of the facilities and services owned and operated by the Regents. Resnick Affidavit, ¶¶ 2 and 3. The Regents administers the University of California under broad authority of the California State Constitution which provides in relevant part that:

> ... the University of California [is] a public trust to be administered by the existing corporation known as 'The Regents of the University of California,' with full powers of organization and government, subject only to such legislative control as may be necessary to insure the security of its funds and compliance with the terms of the endowments of the university.... Said corporation shall also have all the powers necessary or convenient for the effective administration of its trust, including the power to sue and to be sued, to use a seal, and to delegate to its committees or to the faculty of the university, or to others, such authority or functions as it may deem wise.

Cal. Const. of 1879, art. IX, § 9(a), (f).

Accordingly, UCSD, as part of the University of California, is entitled to the same privileges and immunities granted to the Regents and which this court has already found are granted to the University of California's Medical Centers.

A master affiliation agreement ("the Affiliation Agreement") between the Regents on behalf of UCSD, and CHSD provides that CHSD, as an educational courtesy to the Regents, will allow emergency medicine resident physicians accepted by UCSD's emergency medicine residency program, to rotate through CHSD's facilities to gain broader clinical experience that would otherwise be available to such residents training at UCSD alone.[12] McCaslin Affidavit, ¶ 5. The ACGME establishes and oversees the requirements for UCSD's graduate medical education programs, including its emergency medicine residency program. Affiliation Agreement, at 1, § 1.A.

The Affiliation Agreement provides that UCSD conducts graduate medical education programs for resident physicians and fellows ("the trainees") and desires access to facilities in which the trainees can obtain broad clinical experience. Affiliation Agreement, at 1. CHSD maintains facilities which can be used to furnish such clinical experience and desires to have their facilities so used. *Id.* UCSD, rather than CHSD, administers the emergency medicine residency program including selecting the trainees, paying their salaries and placing them in affiliated hospitals. McCaslin Affidavit, ¶¶ 6, 8; Kauder Affidavit, ¶ 11; Affiliation Agreement, §§ I, III and V. CHSD is not involved in advertising or promoting the emergency medicine residency program or in recruiting its residents. McCaslin Affidavit, ¶ 6; Kauder Affidavit, ¶¶ 11, 12. In fact, CHSD has no contact with the emergency medicine residents prior to their rotation through CHSD and such rotations typically last only one to two months. McCaslin Affidavit, ¶ 6.

CHSD receives no compensation for providing these educational resources to UCSD and the trainees receive their sala-

12. A copy of the Affiliation Agreement is attached as Exhibit A to CHSD's Notice of Motion.

ries and benefits from and are insured by UCSD. McCaslin Affidavit, ¶ 8; Affiliation Agreement, § III. CHSD reimburses UCSD for the costs of salaries and benefits of the trainees for the time they are assigned to CHSD. *Id.* CHSD also does not employ the emergency medicine physicians on UCSD's faculty, nor the other physicians practicing emergency medicine in the Emergency Care Center. McCaslin Affidavit, ¶ 9. Beginning in 1990, Children's Associated Medical Group, Inc. ("CAMG"), a professional medical corporation not owned or controlled by CHSD or any of its affiliates, has provided professional medical and administrative services to CHSD, including staffing the Emergency Care Center upon its opening in 1993. *Id.* CAMG currently has contracted with CHSD to provide full emergency physician services to patients seeking emergency room care at CHSD and CHSD does not compensate any of the physicians employed by CAMG for patient care rendered.[13] *Id.* CAMG, rather than CHSD, hires, supervises, compensates and promotes the physicians and neither CAMG nor any of its physicians has any authority to represent CHSD or to act on its behalf as to CHSD's activities. *Id.* UCSD has exclusive control over these matters which are largely assigned to the UCSD emergency medicine program director, appointed by UCSD from the UCSD faculty in accordance with the Affiliation Agreement. McCaslin Affidavit, ¶ 6; Affiliation Agreement, § I.B. Currently, the emergency medicine program director is Dr. David Guss with whom a Dr. Steve Hayden works and serves as the residency director of the emergency medicine residency program. McCaslin Affidavit, ¶ 6.

Under the Affiliation Agreement, CHSD is required to designate, upon consultation with UCSD, a Program Coordinator to coordinate the residents's duty schedules and activities while at CHSD. McCaslin Affidavit, ¶ 7; Affiliation Agreement, § II.C. Dr. McCaslin, as Medical Director of CHSD's Emergency Care Center, supervises the Program Coordinator, Dr. Simon Lucio, with whom he oversees CHSD's activities as they relate to the Affiliation Agreement for emergency medicine residency rotations. McCaslin Affidavit, ¶ 7. CHSD's involvement in the emergency medicine residency training program is limited to supervising and training residents as they rotate through CHSD. McCaslin Affidavit, ¶ 8; Kauder Affidavit, ¶ 11.

Certain physicians from the community who are not CAMG employees also have privileges at CHSD including the Emergency Care Center. McCaslin Affidavit, ¶ 10. However, UCSD emergency medicine residents are supervised primarily by CAMG employed emergency medicine physicians while rotating through CHSD. *Id.* Although some of the emergency medicine residents occasionally may, while rotating through CHSD, work with non-CAMG physicians, the emergency medicine resident physicians are evaluated only by CAMG emergency medicine physicians whose evaluations are collected and sent to UCSD for use by the emergency medicine program director and the residency director. *Id.* The CAMG emergency medicine physicians who supervise the emergency medicine residents do not have faculty credentials at UCSD, although most have been designated as clinical faculty by UCSD in recognition of their teaching commitment at CHSD. McCaslin Affidavit, ¶ 11.

---

**13.** A copy of the current contract between CHSD and CAMG is attached as Exhibit B to CHSD's Notice of Motion.

CHSD, at all times relevant to this action, has never been a member or sponsor of, nor participated in or in any material way associated with Defendants ABEM, CORD or other non-defendants such as SAEM, American Board of Internal Medicine or ACEP. McCaslin Affidavit, ¶ 13. Nor does CHSD require its emergency medicine physicians to be certified by ABEM or eligible for ABEM certification; rather, CHSD's emergency medicine physicians may have completed a residency program in pediatrics, or been certified by the American Board of Pediatrics or the appropriate osteopathic board. Burnham Affidavit, ¶ 4. CHSD, however, has not denied privileges, promotions or a position to any physician based solely on lack of ABEM certification or eligibility. *Id.*

The court finds these affidavits and the Affiliation Agreement establish that CHSD neither owns, sponsors nor operates an emergency medicine residency program of its own and that its participation in UCSD's emergency medicine residency program satisfies both prongs of the *Midcal* test for state action immunity to apply. Specifically, as to the first prong, CHSD's involvement in UCSD's emergency medicine residency program is limited to its voluntary and cooperative participation in a program operated by UCSD, a department of the University of California Medical Center which this court has already determined is immune from liability under both the Eleventh Amendment and state action doctrine. *Daniel, supra,* at 165–71; 188–89. The affidavits and Affiliation Agreement establish that any administrative or supervisory actions or policies by CHSD pertaining to the residents who use CHSD's facilities are dictated by UCSD. Significantly, CHSD receives no compensation from UCSD for permitting its emergency medicine residents to rotate through CHSD. Nor does CHSD participate in or exercise any control over the recruitment, selection or placement of the residents.

Insofar as all emergency medicine teaching staff at CHSD are required to be ABEM certified or eligible, such requirement is imposed by the Affiliation Agreement which requires that CHSD "[m]aintain its license as a general acute care facility and comply with all applicable laws, regulations, JCAHO and ACGME requirements." Affiliation Agreement, § II.F. Although CHSD provides the facilities where UCSD conducts part of its emergency medicine residency program, CHSD's daily administration of that program is limited to supervising the residents to ensure they meet the program's educational goals. As such, CHSD's participation in the UCSD emergency medicine residency program is pursuant to UCSD's clearly articulated state policy as established by UCSD's state mandated medical educational purposes and the Affiliation Agreement.

As to the second element, the record establishes that the Program Director administers and supervises CHSD's participation in UCSD's emergency medicine residency program. The Program Director is designated by UCSD and a member of UCSD's faculty. In contrast, CHSD's Program Coordinator, designated upon consultation with UCSD and supervised by CHSD's Emergency Care Center's Medical Director, coordinates the residents' duty schedules and activities while at CHSD. The Medical Director and the Program Coordinator are responsible for ensuring CHSD's activities as they relate to the Affiliation Agreement for emergency medicine residency rotations. Accordingly, UCSD's Program Director supervises CHSD's actions with regard to the emergency medicine residency program and CHSD's supervision of that program is limited to ensuring that CHSD's participation conforms with the Affiliation Agreement's provisions.

CHSD has thus sustained its burden of demonstrating it is entitled to summary judgment based on state action immunity. The court therefore considers whether Plaintiffs have demonstrated the existence of a genuine issue of material fact sufficient to defeat summary judgment.

Plaintiffs' arguments in opposition to summary judgment are without merit. Plaintiffs first argue that because CHSD's participation in UCSD's emergency medicine residency program is pursuant to the Affiliation Agreement which is a voluntary, negotiated contract that is terminable at will, such participation does not evince the type of state intent necessary to confer state action immunity to a private party. Plaintiff's Memorandum at 10–11. However, as previously stated, anticompetitive action undertaken pursuant to state law as a private party's actions "need not be compelled" to be protected from liability based on state action immunity. *See e.g., Southern Motor Carriers Rate Conference, supra,* at 61–64, 105 S.Ct. 1721. Thus, there is no merit to this argument.

Plaintiffs also initially asserted that CHSD "may" have directly participated in the conspiracy through emergency physicians practicing in its emergency department, including those physicians practicing through CAMG as well as non-CAMG physicians, who are required to be members of CHSD's medical staff and who must comply with the medical staff's bylaws, policies, rules and regulations. Plaintiffs' Memorandum at 11–12. Although Plaintiffs requested and were granted permission to conduct discovery on this point pursuant to Fed.R.Civ.P. 56(f), Plaintiffs have not further developed this issue in supplemental papers submitted in opposition to summary judgment. *See* Fitzgerald Affidavit, ¶ 22 ("Plaintiffs are not supplementing the briefing previously submitted with respect to Children's Hospital."). As such, these equivocal statements are nothing more than mere conclusory assertions which are insufficient to defeat summary judgment. *Goenaga, supra,* at 18.

Nor is there any merit to Plaintiffs' assertion that CHSD admitted that it requires emergency medicine residency training or ABEM certification of its emergency physicians. Plaintiffs' Memorandum at 12 (citing Burnham Affidavit, ¶ 4). This argument demonstrates Plaintiffs' have misconstrued the Burnham Affidavit which states "[i]n order to obtain privileges in emergency medicine at CHSD, a physician must have completed a residency in pediatrics *or* emergency medicine *or* be certified by the American Board of Pediatrics *or* the American Board of Emergency Medicine ("ABEM") (*or* certified by the relevant osteopathic boards.)" Burnham Affidavit, ¶ 4 (emphasis added). The use of the disjunctive "or" demonstrates that a fair construction of this statement is that only one of five disjunctively listed conditions need be met for emergency medicine privileges at CHSD.

Plaintiffs have thus failed to demonstrate the existence of a genuine issue of material fact to defeat summary judgment. Accordingly, CHSD's motion for summary judgment based on state action immunity should be GRANTED.

### CONCLUSION

Based on the foregoing, the motions for summary judgment filed by Defendants Kettering Medical Center (Docket Item No. 776), Children's Hospital—San Diego (Docket Item No. 782), and University Medical Center Corporation (Docket Item No. 783), should be GRANTED.

Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

**ORDERED** that this Report and Recommendation be filed with the Clerk of the Court.

**ANY OBJECTIONS** to this Report and Recommendation must be filed with the Clerk of the Court within ten (10) days of service of this Report and Recommendation in accordance with the above statute, Rules 72(b), 6(a) and 6(e) of the Federal Rules of Civil Procedure and Local Rule 72.3.

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order.* Thomas v. Arn, 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989); *Wesolek v. Canadair Limited,* 838 F.2d 55 (2d Cir.1988).

Let the Clerk send a copy of this Report and Recommendation to the attorneys for the Plaintiffs and the Defendants.

SO ORDERED.

Sept. 27, 2001.